**IT IS ORDERED as set forth below:**

**Date: December 4, 2020**

_____

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 20-69501-JWC |
| NEELKANTH HOTELS, LLC, | CHAPTER 11 |
| Debtor. | |
| U.S. BANK NATIONAL ASSOCIATION, as Trustee for the registered holders of COMM 2012-CCRE3 COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, acting by and through MIDLAND LOAN SERVICES, solely in its capacity as Special Servicer, | CONTESTED MATTER |
| Movant, | |
| v. | |
| NEELKANTH HOTELS, LLC, | |
| Respondent. | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the *Motion For Expedited Relief from the Automatic Stay to Sell Property* (Doc. No. 12) (the "Motion") filed by U.S. BANK NATIONAL ASSOCIATION, as Trustee for the registered holders of COMM 2012-CCRE3 COMMERCIAL MORTGAGE PASS-

1

THROUGH CERTIFICATES, acting by and through MIDLAND LOAN SERVICES, solely in its capacity as Special Servicer ("Movant" or "Midland") on September 15, 2020. Debtor Neelkanth Hotels, LLC ("Debtor") opposes the Motion. The Court held an evidentiary hearing on the Motion on October 15, 2020. Counsel for Midland and Debtor appeared at the hearing and offered several witnesses and various exhibits in support of their respective positions. The Court continued the hearing to October 22, 2020 to allow the parties to make closing arguments. Midland filed a *Motion to Amend Motion for Relief from the Automatic Stay to Assert Additional Grounds for Relief* (Doc. No. 62) on October 21, 2020 requesting the Court consider bad faith as an additional basis to grant stay relief based on evidence at the hearing. Debtor filed a *Post-Hearing Brief in Opposition to Relief from Stay* (Doc. No. 69) on October 23, 2020. Midland also filed a *Supplement Regarding Relief from Automatic Stay* (Doc. No. 74) on October 28, 2020. After consideration of all evidence at the hearing, the briefs and arguments of counsel, and the record in this case, the Court makes the following findings of fact and conclusions of law.

## I.    Jurisdiction

The Court has subject matter jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## II.    Findings of Fact

### A.    Debtor and Midland

Debtor's sole asset is a Hotel located at 302 Green Street SE, Conyers, GA 30012 (the "Hotel"), together with all furniture, fixtures, equipment, and other personal property associated with operation of the Hotel (the "FF&E"). Debtor has operated the Hotel since its construction in 2008. Prior to 2018, the Hotel operated as a Holiday Inn Express under a franchise agreement with Holiday Hospitality, LLC ("Holiday Inn"). The Holiday Inn franchise agreement expired in

October 2018.  Prior to expiration of the Holiday Inn franchise agreement, Debtor entered into a franchise agreement with Best Western International ("Best Western") and closed the Hotel to conduct extensive renovations beginning in 2018.  The renovations cost over $3 million.  Debtor's principals invested over $2 million of their own funds in the renovations.  Since completion of the renovations in 2019, the Hotel has operated as a Best Western Premier.  Debtor has 17 employees, none of which are insiders.

Long before expiration of the Holiday Inn franchise agreement and the renovations, Debtor borrowed $6,000,000 (the "Loan") pursuant to a Loan Agreement with Cantor Commercial Real Estate Lending, LP ("Cantor") on August 30, 2012 (the "Loan Agreement").  Debtor executed a Promissory Note, a Deed to Secure Debt, Security Agreement, Assignment of Leases and Fixture Filing, and an Assignment of Leases and Rents in favor of Cantor, each dated August 30, 2012. The foregoing documents, collectively, are referred to as the "Loan Documents."  Cantor assigned its rights under the Loan Documents to Midland[1] sometime in or before December of 2012.

The Loan Documents, among many other things, required Debtor to obtain lender approval of any new franchise agreement.  Though Debtor appears to have taken efforts to obtain approval of the Best Western franchise agreement, for whatever reason lender approval was not obtained. Midland declared a default, accelerated the debt, and commenced a receivership action in state court in December of 2019.[2]  On February 7, 2020, Debtor and Midland entered into a

---

[1] U.S. BANK NATIONAL ASSOCIATION, as Trustee for the registered holders of COMM 2012-CCRE3 COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES is the actual holder of the Loan Documents, and Midland acts as the special servicer.  For ease of reference, the Court refers to Midland when referring to the holder of the Loan Documents.

[2] The franchise agreement was not the only asserted default, though it is not clear from the evidence whether the franchise agreement, some other default, or a combination thereof was the primary reason Midland initiated the receivership.  Nothing in the record, however, indicates Debtor was significantly behind on its loan payments as of December of 2019 other than a single reference in the Reinstatement that Debtor had failed to make its monthly payment in November of 2019 and thereafter.

Reinstatement and Modification Agreement (the "Reinstatement"), which reinstated the Loan and all Loan Documents as modified by the Reinstatement.

Soon after the Reinstatement the COVID-19 pandemic hit. Debtor defaulted on its payment obligations in April and May of 2020, and Midland sent a demand letter dated May 22, 2020 declaring a default and accelerating all amounts due under the Loan Documents. Debtor did not cure the defaults or make any monthly payments after March of 2020. Midland advertised the Hotel for a nonjudicial foreclosure sale scheduled for September 1, 2020. On August 31, 2020, the day before the scheduled foreclosure, Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[3]

B. Secured Claims

Midland asserts the total amount outstanding under the Loan Documents as of the petition date was approximately $6,058,417.76 and as of the hearing date was north of $6.2 million, though Midland did not provide an exact number.[4] Midland asserts its claims are secured by liens on the Hotel and all Debtor's assets, including all revenue generated by the Hotel ("Rents"). Midland further asserts that all Rents are its "cash collateral." Debtor, to date, has not challenged the validity of Midland's liens or its interest in the cash collateral.

Debtor does dispute, however, the outstanding balance owed to Midland both as of the petition date and as of the hearing date. Debtor scheduled the outstanding debt to Midland in the amount of $4,955,357 and marked the debt as "disputed." This amount is very close to the outstanding principal balance asserted by Midland on the petition date ($4,962,960.56), but

---

[3] All statutory references herein are to the Bankruptcy Code unless indicated otherwise.

[4] Midland filed a proof of claim on November 12, 2020 asserting a total claim of $6,216,150.27 as of the petition date, which includes an additional $117,795.74 for county taxes and $39,936.77 for city taxes not presented at the hearing. Debtor filed an objection to the claim asserting a number objections to various fees and charges asserted in the proof of claim similar to objections raised by Debtor at the hearing. The proof of claim and Debtor's objection, both of which were filed after the hearing, do not change the Court's analysis for purposes of the Motion.

Debtor's scheduled balance does not include any interest or fees.  Midland asserts interest and fees

in excess of $1.2 million were outstanding as of the petition date, including non-default interest of

$131,777, default interest of $101,327, "prior default interest" of $393,162, an "estimated

prepayment compensation/YM Yield Maintenance Calculation" of $532,036.69, attorneys' fees in

the amount of $83,000, and various other fees.  At the time of the hearing, Midland held funds in

a suspense account in the amount of $4,014, a tax account in the amount of $33,018, an insurance

account in the amount of $26,053, and a reserve account in the amount of $170,999, for a total of

$234,084 of funds credited against the outstanding Loan balance.  Debtor challenges a number of

the fees asserted by Midland, in particular the prepayment compensation, attorneys' fees, and

liquidation fees, but Debtor did not offer its own calculation of the outstanding Loan balance as of

the petition date and simply asserts that Midland failed to provide sufficient evidence to prove the

outstanding balance.

At the hearing, Midland offered an exhibit prepared by Wells Fargo (the servicer of the

Loan) with an estimated payoff as of the petition date.  The exhibit provides outstanding principal,

various interest charges, various fees, and the reserve balances as of the petition date.  Midland

also offered the testimony of Steven Taylor, who manages Debtor's Loan at Midland.  Mr. Taylor

testified that he was familiar with the Loan, that he checked the numbers in the payoff statement

with his own records, and that the payoff statement was consistent with his records, though he did

not provide detailed testimony regarding his calculations and records or the methods by which

Wells Fargo prepared the payoff statement.  While Debtor raised challenges to certain fees, such

as the prepayment compensation, attorneys' fees, and liquidation fees, Debtor did not raise any

specific challenge to the asserted interest charges shown on the payoff statement, nor did Debtor

raise any credible reason why the interest charges shown on the payoff statement were inaccurate

or were not due on the petition date.  In fact, Debtor's counsel roughly calculated his own estimate of non-default interest during cross-examination, and his number was very similar to the interest charge shown in the payoff statement.  Further, as part of the Reinstatement, Debtor acknowledged and agreed that default interest in the amount of $393,162.67 had accrued and remained outstanding and due and payable under the Loan.  Lender agreed that it would waive such default interest when the Loan is paid in full, but only under the condition that Debtor make all monthly payments due under the Loan and that no event of default occur after the effective date of the Reinstatement.  Debtor did not raise any significant argument that the prior default interest acknowledged in the Reinstatement and shown in the payoff statement was not due and owing as of the petition date.

The Court need not decide the exact amount of debt owed to Midland because even considering the evidence in the most favorable manner for Debtor, Midland's debt on the petition date was more than $5.3 million,[5] which, as discussed below, is enough to establish that Debtor has no equity in the Hotel or FF&E.  The Court's findings relative to the outstanding debt are limited for purposes of the pending Motion to determine whether Debtor has any equity in the Hotel and/or FF&E and should not be construed as any final determination of the amounts owed as of the petition date or hearing date.

Midland is not the only secured creditor asserting liens on the Hotel and FF&E.  Debtor scheduled a claim of $970,473 for Access Point Financial ("Access Point") secured by Debtor's

---

[5] This number (i) assumes, without finding, that Debtor's scheduled principal balance ($4,955,357) is correct; (ii) accounts only for prepetition interest charges Debtor did not challenge at the hearing or in its objection to Midland's proof of claim, *i.e.*, prepetition nondefault interest ($131,777), prepetition default interest ($101,327), and prior default interest ($393,162), and (iii) deducts all amounts held by Midland in tax, insurance, and reserve accounts ($234,084) as of the hearing.

FF&E.[6]  Debtor did not schedule the claim as disputed, contingent, or unliquidated.  Turn-key Hospitality Solutions, Inc. ("Turn-key") filed a claim in the amount of $118,839 secured against all assets of Debtor.[7]  Midland also offered a judgment in favor of Cummings Resources, LLC in the amount of $60,335.12, but Debtor offered testimony that the claim had been satisfied.

C.  Hotel Value

The parties offered three sources of valuation at the hearing.  First, Midland offered testimony of an expert appraiser and his written report, which provides three different valuations for the Hotel and FF&E:

1.  An "as is" value of $6.1 million as of July 31, 2020, broken down to $5.225 million for the real property and $875,000 for personal property;

2.  An estimated stabilized value of $7.175 million by July 2022, broken down to $6.55 million for real estate and $625,000 for personal property; and

3.  A 90-day quick sale value of $3.65 million, broken down to $3.125 million for the real property and $525,000 for personal property.

Second, Midland submitted a tax bill showing a value of $6.9 million for 2020.

Third, Debtor offered the testimony of its principal, Hemant Thakkar ("Mr. Thakkar"), that the value of the hotel is approximately $8.75 million.

The Court gives little weight to the tax bill, Mr. Thakkar's testimony, or the appraiser's 90-day quick sale value.  The tax bill may or may not have taken into account the effect of the pandemic, and without anyone from the tax assessor's office testifying at the hearing, the Court is

---

[6] While the existence and amount of the Access Point lien is relevant to the Court's ruling on the instant Motion, the priority of that lien is not before the Court at this time and is not directly relevant to the Court's ruling.  The Court makes no ruling or findings related to the priority of any lien on the FF&E.

[7] Though the Turn-key claim was not filed until November 11, 2020 (after the conclusion of the hearing) the Court takes judicial notice of the filed claim.  Further, Midland offered its own evidence of the Turn-key claim at the hearing.

not able to determine what methods the tax assessor used to arrive at its valuation.  Further, Debtor

has appealed that valuation.  As to Debtor's principal, he arrived at his valuation of the Hotel based

on Debtor's cost in the real property and personal property.  The Court does not find Debtor's cost

to be a reliable indicator of fair market value.  Nor does the Court find the 90-day quick sale value

to be a useful measure of the Hotel's fair market value.

The Court accepts the testimony of Midland's expert appraiser and his report as the best

evidence of the Hotel's fair market value as of the petition date and the hearing date.  Midland's

expert has significant experience valuing comparable hotels, and his expertise and knowledge of

both the industry and the methods and conclusions espoused in his report were apparent at the

hearing.  The expert's valuation, however, was dated as of July 31, 2020, and the expert was very

clear that he offered no opinion of value as of the petition date, the date of the hearing, or any date

other than the "as is" value on July 31, 2020 and the stabilized value of $7.175 million in July

2022.  His testimony was that while he expected the property to appreciate in value as the market

stabilizes from the pandemic, the appreciation may not be a smooth line from July 2020 to July

2022, and he could not say what the value of the property might be as of the date of the hearing or

how the property would appreciate between July 30, 2020 and July, 30 2022.

Based on the expert's testimony, the Court concludes that the Hotel, including the FF&E,

was worth no less than $6.1 million as of the petition date, with the real property having a value

of no less than $5.225 million, and the FF&E having a value of no less than $875,000.  The value

of the real property and the overall value may have been a little higher as of the petition date and

the date of the hearing, but the Court will not guess at how much the property may have appreciated

in the three months since July 31, 2020.  Importantly, however, the Court finds that the Hotel's

overall value is likely appreciating currently and will continue to increase during this case absent a turn for the worse in the pandemic or some unforeseen circumstance affecting the Hotel.

### D.  Hotel Condition, Operations, Cash Collateral, and Plan

According to the only evidence put before the Court at the hearing, the Hotel is in good condition following the renovation.  Best Western Premier is a comparable franchise flag to the Holiday Inn franchise flag.  The Court is not aware of any significant deficiencies with the Hotel's condition, operations, or its management.  No evidence was presented that Debtor is mismanaging or not maintaining the Hotel adequately.  Debtor's struggles appear to have stemmed first from the franchise issues in 2018 and 2019, which were resolved by the Reinstatement.  Following the Reinstatement, Debtor's struggles appear to result from the COVID-19 pandemic and the resulting decrease in demand for hotels.  Midland's expert and his report, however, anticipate the Hotel's revenues will recover as the market stabilizes from the pandemic, resulting in an increased value of the Hotel in two years.  His report projects EBITDA for the twelve-month period from July 2020 to July 2021 totaling approximately $205,000.  The report projected an increase of EBITDA to $523,000 the next 12 months and $685,000 the following 12 months.  The EBITDA numbers shown in the appraiser's projections are net of operating expenses, taxes, insurance, and replacement reserves.  According to the appraiser's testimony, EBITDA represents free cash flow available for debt service.   The EBITDA calculation, however, includes an expense for management fees of 4% of sales, which Debtor currently does not pay.

The Court separately entered an order granting authority to use cash collateral through December 31, 2020 (Doc. No. 77) (the "Cash Collateral Order").  The Cash Collateral Order authorizes use of cash collateral only for expenses of maintaining and operating the Hotel.  Debtor has no authority to pay insiders, management fees, estate professionals, or any non-operating

expenses, nor has Debtor requested authority to pay such expenses.  The Cash Collateral Order requires Debtor to give Midland access to its operating accounts so Midland can monitor Debtor's spending.  Debtor must pay to Midland the greater of either 1) all net income after payment of operating expenses approved in the cash collateral budget or 2) interest as provided by 11 U.S.C. § 362(d)(3)(B)(ii).  While Debtor has made a number of mistakes with respect to the Court's previous cash collateral orders and budgets, the Court has seen no evidence that Debtor has engaged in any bad faith conduct with respect to Rents, such as paying insiders, misappropriating funds, or paying any expenses that were not actual operating expenses of the Hotel.  The mistakes were limited to paying actual expenses prior to obtaining authorization (which Debtor's principals were ordered to repay to the estate) or paying expenses not provided for in the approved budget. Despite those mistakes, Debtor paid Midland approximately $28,000 in net operating income for the month of September, which is more than the monthly non-default interest payment due on the Loan.[8]  Midland has not alerted the Court to any further missteps or violations of the Cash Collateral Order since its entry over three weeks ago.

Mr. Thakkar testified that Debtor anticipates a plan by which Debtor pays the Loan and other creditors through funds generated by Hotel operations, and that he and his partner (his brother) would fund any shortfalls while the market stabilizes.  Mr. Thakkar, in response to the question of why he filed the case, also testified, "Well, I had to protect my investment, sir. As I just said, I spent all my life saving of $2 million plus dollars and renovating this property…."  Mr.

---

[8] Midland's counsel indicated at a hearing on cash collateral that Midland disputes the check amount is an appropriate calculation of net income and that Midland did not accept the check.  The Court is not clear whether the parties have resolved this issue or if Midland continues to dispute the amount.  The Court makes no finding relative to that contention and limits its finding to the fact that a check was delivered from Debtor to Midland in the approximate amount of $28,000.

Thakkar gave similar testimony on cross-examination that he desired to protect his and his brother's investment from foreclosure.

## III.     Conclusions of Law

Midland requests the Court grant stay relief pursuant to 11 U.S.C. § 362(d)(1) and (2), which provide:

> On request of a party in interest and after notice and hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> >
> > > (A) the debtor does not have an equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization;

The burden of proof on a motion to lift stay is a shifting one. While Midland must make an initial showing of "cause" in seeking relief, Debtor has the ultimate burden of proof upon all issues other than Debtor's equity in the Property. *In re Allstar Bldg. Products, Inc.*, 834 F.2d 898 (11th Cir. 1987); *In re SW Boston Hotel Venture, LLC*, 449 B.R. 156 (Bankr. Mass. 2011); *In re Kaplan Breslow Ash, LLC*, 264 B.R. 309, 321 (Bankr. S.D.N.Y 2001).

### A.  <u>No Cause to Grant Stay Relief</u>

Under Section 362(d)(1), "cause" for modification of the automatic stay is an intentionally broad and flexible concept that permits the bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations. *In re Texas State Optical, Inc.,* 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995). Midland asserts it is entitled to stay relief for cause because it is not being adequately protected and because the petition was filed in bad faith. The Court addresses both grounds in

turn.

1.   Adequate Protection

First, Midland asserts a lack of adequate protection.  Cause may be proven for lack of adequate protection where a depreciation of security exists during the term of the stay.  *Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988).  Midland's argument on lack of adequate protection is summed up in the Motion as follows:

> Movant's interest as a secured party is not being adequately protected. Based on Debtor's myriad of prepetition and continuing defaults and Debtor's failure and refusal to allow Movant access to the Property to either conduct an appraisal of the Property or to otherwise assess the condition of the Property, Movant has no assurance that Debtor will maintain and operate the Property so as to preserve its value or Movant's right with respect to the Property. Plaintiff likewise has no assurance regarding the use of the Rents generated by the Property. Due to these and general factors applicable to properties such as the Real Property, the value of the Property is subject to rapid and significant diminution and Movant's interests are not adequately protected.

Midland failed to provide any significant evidence supporting its claim that it lacks adequate protection in the Hotel or Rents.   To the contrary, the evidence presented at the hearing showed that Debtor is maintaining and operating the Hotel adequately and that the Hotel is likely to appreciate in value, not decline.  Midland's own expert appraiser testified the Hotel was in good condition and that he expects the value of the Hotel to increase as the economy stabilizes from the pandemic.

As to use of Rents, the Court has already ruled that Midland is adequately protected in the Cash Collateral Order.  Midland has access to Debtor's bank accounts so that it can monitor cash expenditures to ensure Rents are used appropriately to maintain and operate the Hotel.  Midland is entitled to all income above the operating expenses of the Hotel, and Debtor agreed to pay interest in the amount required by § 362(d)(3)(B)(ii) as a condition to further use of cash collateral.

In sum, the condition of the Hotel is good.  It was recently renovated.  It is being adequately

maintained.  The Hotel is likely to increase in value during this case, not decline.  Midland is being adequately protected for the use of Rents as provided in the Cash Collateral Order.  The Court finds there is no basis to grant stay relief for lack of adequate protection.

### 2.  Bad Faith

At the conclusion of the hearing and in subsequent papers, Midland moved to amend its Motion to add bad faith as cause for stay relief.  The primary basis for this position is testimony of Mr. Thakkar at the hearing that he filed the bankruptcy case to protect his investment in the Hotel.  Midland asserts, essentially, that this testimony establishes *per se* grounds entitling it to stay relief for Debtor's bad faith.  The Court disagrees.

"A determination of bad faith is a question of fact and must be made on a case-by-case basis."  *In re Orchard Hills Baptist Church, Inc.,* 608 B.R. 309, 314 (Bankr. N.D. Ga. 2019)(citing *In re SB Properties, Inc.*, 185 B.R. 198, 204 (E.D. Pa. 1995)).[9]  Courts should use their sound discretion in examining the facts of each case.  No particular test for determining whether a petition has been filed in bad faith exists, but courts finding bad faith emphasize an intent to abuse the judicial process and the purposes of the reorganization process.  *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988).  "[C]ourts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or, in particular factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'"  *Phoenix Piccadilly*, 849 F.2d at 1394 (citing *Albany Partners*, 749 F.2d at 674).  Factors courts use to analyze bad faith include the following:

     i.    Whether the debtor has few or no unsecured creditors;
    ii.    Whether there has been a previous bankruptcy petition by the debtor or a related entity;

---

[9] A number of cases cited in this section relate to bad faith as grounds for dismissal under § 1112, but "[t]he test for determining whether a bankruptcy case was filed in bad faith is the same under Section 362 and Section 1112(b)."  *In re Club Tower L.P.,* 138 B.R. 307, 310 (Bankr. N.D. Ga. 1991)

iii.    Whether the pre-petition conduct of the debtor has been improper;
iv.    Whether the petition effectively allows the debtor to evade court orders;
v.    Whether there are few debts to non-moving creditors;
vi.    Whether the petition was filed on the eve of foreclosure;
vii.    Whether the foreclosed property is the sole or major asset of the debtor;
viii.    Whether the debtor has no ongoing business or employees;
ix.    Whether there is no possibility of reorganization;
x.    Whether the debtor's income is sufficient to operate;
xi.    Whether there was no pressure from non-moving creditors;
xii.    Whether reorganization essentially involves the resolution of a two-party dispute;
xiii.    Whether a corporate debtor was formed and received title to is major assets immediately before the petition; and
xiv.    Whether the debtor filed solely to create the automatic stay.

*Orchard Hills*, 608 B.R. at 314-15 (citing *SB Properties*, 185 B.R. at 205).  A mechanical application of the listed factors is inappropriate, as the focus of the inquiry should be the presence or absence of the honest intention of the debtor.  *Orchard Hill*, 608 B.R. at 315 (citing *In re Park Forest Dev. Corp.*, 197 B.R. 388, 393-94 (Bankr. N.D. Ga. 1996)).  The Court has broad discretion to evaluate the totality of the circumstances in each case to determine whether those circumstances evidence bad faith.  *Id.* (citing *In re Southside Church of Christ of Jacksonville, Inc.*, 572 B.R. 384, 388 (Bankr. M.D. Fla. 2017)).

Nothing in the Court's review of the above cases or the cases cited by Midland support the proposition that a debtor's principal's desire to protect his investment is dispositive of bad faith.  Quite the opposite is true.  The Court must examine myriad factors and the totality of the circumstances, not a single statement that a debtor's principal desired to protect his equity investment.  While a principal's desire to protect equity might be an indication of bad faith, it is not always evidence of bad faith, and it is by no means dispositive.  The cases cited by Midland are both factually distinct from the present case and contrary to Midland's position on the law.

Midland cites *In re Humble Place Joint Venture*, 936 F.2d 814 (5th Cir. 1991), which affirmed a bankruptcy court's ruling to dismiss for bad faith.  Far from endorsing Midland's

position that protecting a principal's investment is dispositive of bad faith, the *Humble Place* opinion makes clear that the decision rested on a fulsome analysis of multiple factors that, on the whole, led the bankruptcy court to find bad faith. The debtor in *Humble Place* owned an undeveloped piece of property, had no employees, and its primary business consisted of "mowing the grass and waiting for the market to turn." *Id.* at 817. The bankruptcy court found the principle motive behind the bankruptcy was to "cleanse the partners of their liability," and the 5th Circuit agreed that such a goal was not a legitimate concern of chapter 11.[10] Maintenance of the partners' equity was a contributing factor to finding bad faith, but the analysis of equity preservation is far more nuanced than Midland acknowledges and even suggests preservation of equity can be a legitimate goal of bankruptcy if the cost and risk of bankruptcy are not depleting equity.[11] The present case stands in stark contrast to the facts in *Humble Place*. Debtor here has a fully developed, long operating, newly renovated hotel, numerous employees, and cash flow sufficient to fund operations. Interestingly, *Humble Place* offers its own internal distinction to the present case by using an operating hotel as a hypothetical contrast to the debtor in *Humble Place*: "The bankruptcy court's description serves adequately, however, to distinguish the state of Humble Place from a debtor which owned an *operating* single asset such as a hotel or restaurant." *Id.* at

---

[10] Midland argues that such motive can be inferred here because Mr. Thakkar and his brother are personally liable on the Loan. There was some testimony about personal guarantees at the hearing, but no guarantees were put into evidence, and the testimony was somewhat confusing. Mr. Thakkar testified about having the ability to walk away under a limited guaranty, but Midland's counsel on cross examination asked questions indicating that full recourse guarantees were signed in connection with the Reinstatement. Without the guarantees in the record, the Court is not clear on whether Mr. Thakkar and his brother are subject to full guarantees or limited guarantees. Regardless, nothing in Mr. Thakkar's testimony or the evidence leads the Court to believe that cleansing personal liability was a significant motivation in filing this case, and the Court will not infer such a motive simply because guarantees of some sort exist.

[11] "[T]he preservation of the investors' equity must be evaluated in the harsh light of the ongoing costs of bankruptcy administration and taxes, which deplete such equity at a steady pace. The court implicitly found that the risk to secured creditors of a continuing Chapter 11 case outweighed the benefit to Humble Place, particularly because the partnership's estimate of 'equity' in the property subject to Post Oak Bank's lien depended upon a five-year sales period to achieve 'fair market value.'" *Id.* at 818.

817.  "There are several instances in which even one-asset real estate ventures would invoke Chapter 11 in good faith: the asset may be an operating business, like a ranch or a hotel. . . ."  *Id.*

Midland also cites *In re Vallambrosa Holdings, LLC*, 419 B.R. 81 (Bankr. S.D. Ga. 2009). *Vallambrosa* nowhere suggests equity preservation is dispositive of bad faith and explicitly confirms no *per se* factor in the bad faith analysis: "[T]he factors cited by both the Eleventh Circuit and other courts are guidelines for the exercise of the Court's sound discretion.  Bad faith in the filing of a bankruptcy petition is a finding of fact not subject to any per se approach."  *Id.* at 86 (citing *In re Clinton Fields, Inc.,* 168 B.R. 265, 269–271 (Bankr. M.D. Ga. 1994)).  Moreover, *Vallambrosa* does not list equity preservation in its factors weighing in favor of bad faith.  It finds a desire to preserve equity does not preclude a finding of bad faith, but it suggests preservation of equity can weigh in favor of finding good faith.[12]  Thus, the case, on its face, does not support the argument that Mr. Thakkar's desire to protect his investment, standing alone, is necessarily an indication of bad faith, much less dispositive.  Factually, *Vallambrosa* is easily distinguished for similar reasons as *Humble Place*.  The *Vallambrosa* debtor owned a single undeveloped parcel of real estate with no operations, no employees, and no means of obtaining $5 million needed to fund its plan, contrasted to Debtor here with an operating hotel, employees, and operating cash flow.

The Court's reading of *Humble Place* and *Vallambrosa* is that a debtor's desire to preserve equity could weigh for or against a finding of good faith depending on the circumstances.  If a debtor's desire to preserve equity, or protect a principal's investment, was dispositive of bad faith, then few cases filed in this Court would last very long, and the Court's handling of chapter 13 cases would likely grind to a halt.  The Court declines to adopt Midland's assertion that Mr.

---

[12] "Although Debtor had some equity in the property and could have arguably filed its petition to preserve that equity, that is not persuasive in this particular case as explained in the next section of this Order.  Furthermore, possible equity in the property or a potential for a successful reorganization does not preclude a finding of a bad faith filing." *Vallambrosa* 419 B.R. at 86 (citing *Phoenix Piccadilly,* 849 F.2d at 1395).

Thakkar's testimony is dispositive of bad faith.

The Court now turns to the factors listed above that courts often consider in determining whether a filing has been made in bad faith:

    i.   <u>Whether the debtor has few or no unsecured creditors</u>:  While Midland is by far the largest creditor, Debtor scheduled approximately 43 unsecured creditors, which mostly appear to be employees and operating vendors.  Debtor's amended schedules show approximately $215,000 for general unsecured claims, though approximately $45,000 of that total is allocated to Turn-key.   Regardless of the exact number and amount of unsecured claims, this is not the case of a non-operating entity with one large secured lender and *de minimus* unsecured creditors.   Though small in comparison to Midland's claims, Debtor's unsecured creditors are significant in both number and size.

   ii.   <u>Whether there has been a previous bankruptcy petition by the debtor or a related entity</u>:  The Court is not aware of any previous bankruptcy cases.

  iii.   <u>Whether the prepetition conduct of the debtor has been improper</u>: The Court is not aware of any improper conduct by Debtor or its principals prior to the bankruptcy case.  Debtor had issues with its franchise agreement and has fallen behind on payments since the Reinstatement and during the pandemic, but the Court is unaware of any allegations that Debtor is mismanaging the Hotel, engaging in self-dealing, or engaged in improper conduct (other than cash collateral issues that have been addressed by separate order).

  iv.   <u>Whether the petition effectively allows the debtor to evade court orders</u>:  The Court is not aware of any court orders Debtor is evading through this case.

v.  <u>Whether there are few debts to non-moving creditors</u>:  In addition to the unsecured creditors and Midland, Access Point has a secured claim of $970,000.  This is a significant claim.  Turn-key has filed a secured claim exceeding $100,000 and has expressed its opposition to Midland's Motion and its preference for allowing Debtor to continue in bankruptcy to reorganize, which it believes would be in the best interest of creditors other than Midland.

vi.  <u>Whether the petition was filed on the eve of foreclosure</u>:  Debtor filed the petition on the literal eve of foreclosure.

vii.  <u>Whether the foreclosed property is the sole or major asset of the debtor</u>:  This is a single asset real estate case and the scheduled foreclosure was related to Debtor's primary asset—the Hotel.

viii.  <u>Whether the debtor has no ongoing business or employees</u>:  Debtor is operating and has 17 non-insider employees.

ix.  <u>Whether there is no possibility of reorganization</u>:  This factor will be analyzed in more detail in the section on § 362(d)(2), but it is not apparent that Debtor has no possibility of reorganizing.  Quite the opposite is true.

x.  <u>Whether the debtor's income is sufficient to operate</u>:  Debtor's income thus far in the case has been sufficient to fund operations with some excess to pay Midland adequate protection payments.

xi.  <u>Whether there was no pressure from non-moving creditors</u>:  Debtor is not aware of any pressure from Access Point, but there is some indication in the record that other creditors, such as Cumming Resources and Turn-key were pressing lien claims in court or otherwise.

xii.   <u>Whether reorganization essentially involves the resolution of a two-party dispute</u>:
While Midland appears to be the major creditor in this case, by far, Access Point has
a significant secured claim that it asserts has priority to Midland's claims against the
FF&E.

xiii.   <u>Whether a corporate debtor was formed and received title to its major assets
immediately before the petition</u>:  Debtor was not created immediately before the
petition date.  Rather, Debtor has been operating since 2008 when it constructed the
Hotel.

xiv.   <u>Whether the debtor filed solely to create the automatic stay</u>:  While Debtor filed on
the eve of foreclosure, the Court does not believe this case was filed for no purpose
other than to delay an inevitable foreclosure by Midland.

Most of these factors weigh against a finding of bad faith.  In particular, the fact that Debtor
is operating a hotel with multiple employees and cash flow sufficient to fund operations[13] is a
strong distinction from the typical bad faith single asset cases, which usually involve undeveloped
or partially developed real property with no employees and no significant operations.  The only
meaningful factors weighing in favor of finding bad faith are that Debtor filed bankruptcy on the
eve of foreclosure of the Hotel by its largest creditor.  If these factors alone were enough to support
a finding of bad faith, then it is difficult to imagine many single asset chapter 11 cases that would
not qualify as bad faith filings.  And this case is not the typical single asset case filed on the eve
of foreclosure.  Midland is the largest creditor, but it is not the only significant creditor, and this is
not a classic two-party dispute in single asset cases with one secured creditor and a few miniscule
unsecured claims.  It may be true that Debtor filed on the eve of foreclosure to harness the

---

[13] Debtor's cash flow is sufficient to fund operations and some amount is available to pay Midland adequate protection
payments, but it is not clear that cash flow is sufficient to fully fund Midland's debt or other creditors at this time.

automatic stay, but it is not apparent that Debtor did so for the single purpose of delaying the inevitable.

Nor does the Court put significant weight on Mr. Thakkar's testimony about protecting his investment as a sign of bad faith. As Midland states in its brief, "it is axiomatic that a Chapter 11 filing motivated by something other than a desire to rehabilitate a financially distressed but viable entity or to preserve and maximize asset values for the creditor-beneficiaries of an orderly liquidation constitutes bad faith. *See e.g.*, *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship, 526 U.S. 434, 453 (1999).*" The problem for Midland is that the evidence shows this Debtor fits neatly within the first category of axiomatic bankruptcy purposes: rehabilitation of a financially distressed but viable entity. Debtor's problems, as far as the Court can tell from the evidence, stemmed first from the franchise agreement issues in 2018, which were cured by the Reinstatement, and then the general decline in demand for hotels from the COVID-19 pandemic. There is nothing intrinsically unviable about this Debtor or the Hotel. The evidence indicates that this Debtor may be able to rehabilitate itself once the market stabilizes from the pandemic. Debtor may need some help to get there, and it remains to be seen if it will, but this is not a case of an undeveloped parcel of real estate with no operations, no employees, and no hope to pay its secured creditors other than waiting years in hopes that an unpredictable real estate market turns. The Court does not believe that Debtor's desire to forestall the end of its business while it weathers a once-in-a-lifetime global pandemic, by itself, shows an abuse of the judicial process. The Court declines to grant stay relief for bad faith.

B.  Lack of Equity in the Property

Midland also moves for stay relief under § 362(d)(2), which requires stay relief if the debtor

lacks equity in the property and the property is not necessary to an effective reorganization.

### 1. Debtor Has No Equity in the Hotel or FF&E

Much of the hearing and evidence was devoted to determining whether Debtor has any equity in the Hotel. The Court easily finds Debtor does not have any equity in the Hotel or FF&E. As discussed above in the Court's factual findings, the best evidence of value is that the Hotel was worth $6.1 million a month before the petition date, with $5,225,000 allocated to the real property and $875,000 allocated to the FF&E. Midland's debt as of the petition date was at least $5.3 million, and Access Points' claim on the FF&E was $970,000 according to Debtor's own schedules. These debts respectively exceed the value of the real property and FF&E provided in the July 30, 2020 appraisal. While the value of the Hotel may have gone up a little since the date of the appraisal, the Court does not have any evidence or indication that it has appreciated enough to surpass the claims of Midland and Access Point, much less after adding the Turn-key claim to the total.

### 2. The Hotel Is Necessary to an Effective Reorganization

Equity is not the end of the analysis under § 362(d)(2). "Once lack of equity is shown, the debtor must establish that the collateral is necessary for an effective reorganization, not by showing that, absent retention of the Property, no reorganization is possible, but by proving 'the property is essential for an effective reorganization *that is in prospect.*'" *In re Kaplan Breslow Ash, LLC*, 264 B.R. 309, 322 (Bankr. S.D.N.Y. 2001) (citing *Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988) (emphasis in original)). This means simply that there must be a reasonable possibility of a successful reorganization within a reasonable time. *Timbers*, 484 U.S. at 375-76.

As to the first part of the test, that the property be "necessary," there is no question the

21

Hotel is necessary to Debtor's reorganization.  The Hotel is Debtor's primary asset and only way to generate income to service its debts long term.  Simply put, without the Hotel, there is no Debtor, and there is no case.

The second part of the test, the requirement that Debtor establish a reasonable possibility of reorganization within a reasonable time, has different meanings depending on the state of the proceeding.  As a number of courts have held, in the initial stages of a chapter 11 proceeding, the debtor should be granted significant leeway in attempting to establish that a successful reorganization is possible.  As the case progresses, however, the burden of proof required of the debtor increases.  *See In re Building 62 Ltd. P'ship*, 132 B.R. 219, 222 (Bankr. D. Mass. 1991) and *In re Ashgrove Apartments of DeKalb County Ltd.*, 121 B.R. 752 (Bankr. S.D. Ohio 1990)). Factors courts consider in determining whether a debtor has met its burden include:

1.  The debtor is moving meaningfully to propose a plan of reorganization;

2.  The proposed or contemplated plan has a realistic chance of being confirmed;

3.  The proposed plan is not patently unconfirmable;

4. The length of time the case has been pending;

5.  The presence or absence of pre-petition or post-petition negotiations among the parties;

6.  The length of time the debtor has been in possession and operating its business;

7.  The presence or absence of good faith efforts by the parties to negotiate a consensual solution to the case;

8.  The length of time since the expiration of the exclusivity period; and

9.  Any other relevant factors.

The above list is illustrative, not exhaustive, and the factors are meant to provide an outline of

considerations for courts.  *In re Ashgrove Apartments*, 121 B.R. at 756-57.

Several of the factors are not relevant because no plan has been proposed at this time, but that is not a fact weighing in favor of stay relief.  It is simply too early in this case to have required a plan to be filed.  The case was younger than 60 days when the hearing concluded, well short of any plan deadlines or exclusivity periods under the Bankruptcy Code.  The closest deadline is the 90-day period found in § 362(d)(3), which is applicable to Debtor as a single asset real estate debtor.  That section gives a single asset real estate debtor 90 days either to file a plan with a reasonable possibility of being confirmed within a reasonable time or pay non-default contract interest to the secured lender.  That deadline was still over a month away at the conclusion of the hearing and is not really a deadline if Debtor can satisfy the second option under § 362(d)(3) to pay non-default interest.  Debtor must satisfy its obligations under § 362(d)(3) or risk stay relief, but until Debtor actually fails to satisfy its obligations, the Court will not penalize Debtor for not having a fully formed plan in the first 60 days of its case.[14]

The fourth factor weighs in favor of Debtor because the case simply is not far enough along for much to have happened other than the very contested hearings on cash collateral and stay relief. Similarly, the eighth factor weighs in favor of Debtor because exclusivity has not yet passed.

The fifth and seventh factors are mixed.  The parties negotiated the Reinstatement in February, but since then it appears there has been little effort between the parties to resolve their differences, whether pre- or post-petition.  Indeed, this case has been quite adversarial so far.  But, again, it is still early in the case, and the Court is not prepared to conclude that the parties cannot negotiate a resolution to this case.

The Court finds the sixth factor weighs in favor of Debtor.  Debtor has been operating the

---

[14] The Court gives no opinion on the arguments of Debtor and Midland on whether the requirements of § 362(d)(3) supersede § 362(d)(2) for single asset real estate debtors.

Hotel since 2008, and the Court is not aware of any significant issues with operations or its ability to service Midland's debt prior to the franchise issues in 2018 and 2019 and then the pandemic.

The real question, however, is whether Debtor has shown it has a reasonable chance of servicing Midland's debt, other creditors, and paying the costs of case administration. As discussed above, Debtor is generating sufficient income to support operations and paid Midland approximately $28,000 of net income in September. That number by itself likely would not be enough to service the Midland debt and other creditors under a plan. The principal and interest payment to Midland on its debt service under the non-default contract rate prior to bankruptcy was approximately $35,760. Midland's appraiser projected net income available to service debt (after taking into account management fees, taxes, insurance, and reserves) in the amount of approximately $205,000 in the 12 months from July 2020 to July 2021. That breaks down to approximately $17,000 per month, far short of servicing Midland's debt, much less other creditors and the cost of case administration. But the appraiser forecasts approximately $523,000 in the following 12 months. That breaks down to approximately $43,000 per month. Is that number achievable? Would it be enough to service Midland's debt and other creditors under a plan? Can debtor find the funds to pay the expenses of this chapter 11 case, meet its requirements under § 362(d)(3), and fund a plan until its income recovers? The answers remain to be seen, but Debtor's September numbers appear to have tracked above the appraiser's projections. Further, Mr. Thakkar gave testimony that he and his brother, or potentially others, could provide funds to make up any shortfalls from operations to service debt under a plan. While Mr. Thakkar and Debtor did not provide evidence of his financial condition at the hearing, Mr. Thakkar and his brother have invested significant money in the Hotel in the past two years; far more, in fact, than likely would be needed to make up funding shortfalls in the near future. While this evidence may not be enough

to prove feasibility of a plan, Debtor is not required to prove feasibility at this early stage of the case, and the Court finds the evidence sufficient to show Debtor has a reasonable prospect of confirming a plan within a reasonable time.

Accordingly, it is

**ORDERED** that the Motion is **DENIED**.

The Clerk is directed to serve a copy of this order on Debtor, Debtor's counsel, counsel for Midland, the United States Trustee, and the parties in the below distribution list.

## END OF DOCUMENT

**Distribution List**

US Bank N.A. by Midland Loan Services
c/o David Gay
Carlton Fields, PA
100 SE 2nd Street, Suite 4200
Miami, FL 33131-2113

CARLTON FIELDS, P.A.
Justan C. Bounds
1201 West Peachtree Street, Suite 3000
Atlanta, Georgia 30309