**IT IS ORDERED as set forth below:**

**Date: October 22, 2021**

_____

**Jeffery W. Cavender**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 20-69501-JWC |
| NEELKANTH HOTELS, LLC, | CHAPTER 11 |
|     Debtor. | |
| NEELKANTH HOTELS, LLC, | |
|     Movant, | |
| v. | CONTESTED MATTER |
| U.S. BANK NATIONAL ASSOCIATION, Trustee for the registered holders of COMM 2012-CCRE3 COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES acting by and through KEYBANK NATIONAL ASSOCIATION, as Special Servicer | |
|     Respondent. | |

## <u>Order and Memorandum Opinion</u>

## I.   <u>INTRODUCTION</u>

Before the Court is Neelkanth Hotels, LLC's Objection to Claim No. 5 filed by U.S. Bank National Association as Trustee for the registered holders of COMM 2012-CCRE3 Commercial Mortgage Pass-Through Certificates acting by and through KeyBank National Association, as Special Servicer ("U.S. Bank") [Doc. 81] (the "Objection"),[1] which came before the Court for an evidentiary hearing on August 24, 2021.   After fully considering the evidence and testimony adduced at the hearing, the arguments of counsel, the written briefs of the parties submitted before and after the hearing, and the record in the case, the Court will sustain the Objection in part and overrule the Objection in part as set forth below.

## II.   <u>PROCEDURAL BACKGROUND</u>

Neelkanth Hotels, LLC ("Debtor") commenced this Chapter 11 case on August 31, 2020 on the eve of a foreclosure sale being conducted on behalf of U.S. Bank.   Debtor owns and operates a hotel franchised as a Best Western Premier in Conyers, Georgia.   U.S. Bank asserts a lien against all of Debtor's assets and filed a proof of claim [Claim No. 5-1] and amended claim [Claim No. 5-2] asserting a prepetition claim against Debtor in the amount of $6,211,853.17.[2]   Among other things, the claim includes the following fees, expenses, or charges to which Debtor objected: $83,000 in prepetition legal fees, a liquidation fee of $57,264.74, special servicer fees in the amount of $7,299.48, a Phase I environmental survey fee of $2,750, property protection advances

---

[1] At the time the Objection was filed Midland Loan Services was the special servicer instead of KeyBank National Association.

[2] U.S. Bank argues that it amended its claim subsequent to Debtor's Objection, and Debtor has not filed an additional objection to its amended claim.  While U.S. Bank is technically correct, that does not resolve Debtor's Objection as U.S. Bank's amended claim does not resolve any of the objections raised by Debtor.  The Court considers Debtor's Objection as it applies to the amended claim.  *See In re Goodman*, 261 B.R. 415 (Bankr. N.D. Tex. 2001).

of $450, a payoff processing fee of $1,200, a yield maintenance premium of $532,036.69, ad valorem taxes to Rockdale County in the amount of $117,795.74, and ad valorem taxes owed to the City of Conyers of $39,936.77.[3]  Debtor and U.S. Bank resolved Debtor's objection to the ad valorem taxes by separate order [Doc. 199], and U.S. Bank waived its inclusion of the special servicing fees, the payoff processing fee, and the property protection advance [Doc. 204, p. 8] thereby voluntarily reducing its claim by $8,949.48.  For the reasons discussed below, U.S. Bank's entitlement to the remaining contested fees, expenses, and charges are resolved as follows:

(1) Debtor's objection to U.S. Bank's attorney's fees and expenses will be sustained in part and overruled in part, and U.S. Bank will be allowed prepetition attorney's fees and expenses in the amount of $41,289.71;

(2) Debtor's objection to the liquidation fee will be sustained, and such claim will be disallowed without prejudice to U.S. Bank's right to assert a claim for any liquidation fee as and when such fee becomes payable in the future;

(3) Debtor's objection to the environmental survey fee will be sustained, and that portion of the claim will be disallowed; and

(4) Debtor's objection to the yield maintenance premium will be sustained in part and overruled in part, and U.S. Bank will be allowed a yield maintenance premium in the amount of $49,629.60, representing 1% of the outstanding principal of the loan, without prejudice to U.S. Bank's right to offer additional evidence at the hearing on confirmation of Debtor's proposed plan with respect to any additional premium that may be payable in accordance with the terms of the

---

[3] Debtor's Objection included an objection to an appraisal fee of $5,000.  Debtor did not prosecute that portion of its Objection at the hearing or in subsequent briefing, and therefore, the Court deems any objection to the appraisal fee as abandoned by Debtor. *See generally In re Maxxis Grp., Inc.*, No. 03-77243-MGD, 2009 WL 6527594, at *1 (Bankr. N.D. Ga. Sept. 30, 2009) (claim abandoned for failure to affirmatively prosecute).  An expected result given that section 5.1.26 of the loan agreement specifically provides for reimbursement of appraisal fees.

loan documents as set forth below.  Debtor raises no objection to the balance of U.S. Bank's claim, and U.S. Bank will have an allowed prepetition claim in the amount of $5,618,770.67.[4]

## III.    JURISDICTION

The Court has jurisdiction to hear and determine this dispute pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).  The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bank. P. 7052.

## IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

Section 502(a) of the Bankruptcy Code[5] provides that absent objection from a party in interest a filed proof of claim is deemed allowed.  11 U.S.C. § 502(a).  If an objection to the claim is filed, then the court must determine the validity and amount of the claim.  11 U.S.C. § 502(b)(1). Among the grounds for disallowance of a claim under § 502 is if the claim is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured…."  *Id.*  Courts look to state law to determine the amount and validity of a claim.[6]

The burden of proof for claims asserted in a bankruptcy case rests on different parties at different times.  *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *Broadfoot v.*

---

[4] The $6,211,853.17 amount asserted in its proof of claim less $8,949.48 for special servicing fees, the payoff processing fee, and the property protection advance waived by U.S. Bank, less $41,710.29 in disallowed attorney's fees and costs, less the $57,264.74 disallowed liquidation fee, less the $2,750 disallowed environmental survey fee, and less the $482,407.99 disallowed yield maintenance premium.

[5] All statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*, unless otherwise specified.  All references to a "Federal Rule" are to the Federal Rules of Civil Procedure.  All references to a "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

[6] *Travelers Casualty & Surety Co. of America, v. Pacific Gas and Elec. Co.,* 549 U.S. 443 (2007); *Welzel v. Advocate Realty Investments, LLC (In re Welzel),* 275 F.3d 1308, 1313 (11th Cir. 2001).

*Jamestown Mgmt. Corp. (In re Int'l BioChemical Indus., Inc.)*, 521 B.R. 395, 398 (Bankr. N.D. Ga. 2014).  A proof of claim filed in accordance with the Bankruptcy Rules constitutes "prima facie evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).  A party objecting to a proof of claim bears the burden of overcoming the prima facie validity of the claim, but once it has done so, "the burden of proof shifts to the claimant to prove its claim by a preponderance of the evidence."  *In re Beaulieu Group, LLC*, 616 B.R. 857, 863 (Bankr. N.D. Ga. 2020).  At the hearing on the Objection, the Court determined that Debtor satisfied its burden of overcoming the prima facie validity of U.S. Bank's claim, and, as a result, U.S. Bank bears the burden of proof to establish its claim.  The Court addresses each of the objections raised by Debtor with that burden in mind.[7]

### A.      Legal Fees

Debtor objects to U.S. Bank's inclusion of $83,000 in legal fees as part of its prepetition claim.  Debtor's objection raises issues as to amount of the fees asserted as well as the reasonableness of the fees claimed.

#### 1.      Amount of Fees

Debtor raises two objections to the amount of legal fees.  First, Debtor points to the billing compilation provided by counsel for U.S. Bank in support of the claim, which totals only $80,534.85 in fees and expenses, an amount less than the $83,000 asserted in the claim.  Second, Debtor argues that a portion of the fees asserted were waived by U.S. Bank by agreement and cannot now be recovered as part of its claim.  Debtor points to the prepetition Reinstatement Agreement between the parties dated February 7, 2020.  Under that agreement, Debtor paid a

---

[7] U.S. Bank both at the hearing and in its written briefs before and after the hearing raised arguments that Debtor waived certain objections and raised certain objections for the first time at the hearing or following its Objection such that it was experiencing trial by ambush.  As the Court noted at the hearing, U.S. Bank's arguments on this front have no merit.

"Reinstatement Amount" made up of various fees and expenses due to U.S. Bank as of the "Effective Date" of the agreement, including legal fees and costs of counsel of $96,564.00. Having paid the Reinstatement Amount in accordance with the agreement, Debtor argues U.S. Bank is precluded from asserting fees and expenses that predate the effective date of the Reinstatement Agreement, including fees and expenses from January 2020 through February 7, 2020 in the amount of $24,605.

As to the discrepancy between the legal fees asserted in the claim and the amount reflected in the billing compilation, U.S. Bank responds that it provided the billing compilation to counsel for Debtor in February, 2021, along with an explanation of the difference between the two numbers. Merrick Gross, a shareholder at Carlton Fields, P.A. and the billing partner on this matter, testified that the $83,000 number included both prepetition and post-petition amounts and that counsel for U.S. Bank provided supplemental billing information to Debtor showing $77,315 in prepetition fees and $3,219.85 in prepetition costs. U.S. Bank's proof of claim was never amended to reflect the reduced amount, but U.S. Bank acknowledges that its claim should be reduced by the difference, which equals $2,465.15. Additionally, following the hearing U.S. Bank filed a Declaration of Merrick L. Gross [Doc. 211] which sought to clarify and correct certain testimony offered by Mr. Gross at the hearing. Mr. Gross's declaration confirmed, contrary to his testimony at the hearing, "that certain credits were applied by the firm post-petition to fees incurred pre-petition" and that "a total amount of $39,245.14 in post-petition credits was applied to pre-petition costs and fees incurred and provided by Carlton Fields. Of that total $24,605 applied to fees and costs incurred prior to February 7, 2020[.]" *Id.* At a telephonic hearing held on September 22, 2021, counsel for U.S. Bank confirmed that its request for prepetition fees and expenses should be further reduced by the amount of $39,245.14 in light of the post-petition credits. This reduction

resolves the Debtor's challenge to the fees based on amounts included and paid under the Reinstatement Agreement. U.S. Bank's voluntary reduction of its fees based on the post-petition credits removes from its claim any request for fees and expenses incurred prior to the Reinstatement Agreement, and Debtor's objection to the fees and expenses requested on that basis is overruled as moot.

### 2.    Reasonableness and Other Arguments

Debtor also raises other arguments as to the fees and expenses incurred, none of which from the Court's perspective require further reduction of U.S. Bank's attorney's fees claim. Debtor points to the attorney's fees provisions of the loan agreement in sections 5.1.14[8] and 10.13 and argues U.S. Bank failed to present competent evidence as to its entitlement to fees under either provision. As to fees and expenses payable pursuant to section 5.1.14, Debtor argues that such provision only authorizes attorney's fees and expenses incurred in connection with foreclosure or this bankruptcy case. Debtor quotes the applicable provision but then ignores the very language it quotes. Section 5.1.14 of the loan agreement provides:

> In the event (a) that the Security Instrument is foreclosed in whole or in part or that the Security Instrument is put into the hands of an attorney for collection, suit, action or foreclosure…or (c) of a Bankruptcy Action related to Borrower…Borrower, on behalf of itself and its successors and assigns, agrees that it/they shall be chargeable with and shall pay all costs of collection and defense, including attorneys' fee and expenses, and court costs, incurred by Lender or Borrower in connection therewith….

[Deb. Ex. 1, p. 59]. Debtor's arguments read "for collection, suit, action" and the "cost of collection" completely out of the provision and improperly narrow the breadth and scope of the provision. If that were not plain enough, section 10.13 of the loan agreement provides additional provisions for recovery of reasonable attorney's fees and disbursements over a very broad range

---

[8] The Debtor in its closing arguments references section 5.1.14 as being in the security deed. It actually appears in the loan agreement.

of activities, all of which clearly cover the services rendered by U.S. Bank's counsel in this case. [Deb. Ex. 1, p. 90-91]. In response Debtor argues, yeah but the fees must be reasonable, and U.S. Bank offered no evidence as to the reasonableness of the fees. U.S. Bank disagrees.

As Debtor correctly notes, the Eleventh Circuit previously concluded that § 506(b) applies a reasonableness standard across-the-board to all contractually set attorney's fees sought by over-secured creditors, whether incurred on a prepetition or post-petition basis. *In re Welzel*, 275 F.3d at 1315. Thus, fees deemed allowable under § 502 must also be reviewed for reasonableness under § 506(b) for over-secured creditors.[9] In assessing the reasonableness of the fees incurred, the Court must conduct the lodestar analysis set forth in *Johnson v. Ga. Hwy. Express Inc.*, 488 F.2d 714 (5th Cir. 1974). *See Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292 (11th Cir. 1988). The factors courts consider in conducting that analysis are the following:

    1. the time and labor required,

    2. the novelty and difficulty of the questions,

    3. the skill requisite to perform the legal service properly,

    4. the preclusion of other employment by the attorney due to acceptance of the case,

    5. the customary fee for like work,

    6. whether the fee is fixed or contingent,

    7. time limitations imposed by the client or the circumstances,

    8. the amount involved and the results obtained,

    9. the experience, reputation, and ability of the attorneys,

    10. the undesirability of the case,

---

[9] The Court makes no findings in this Order as to whether U.S. Bank is an over-secured creditor, but based on its previous valuation determination at Doc. 83, that appears to be the case.

11. the nature and length of the professional relationship with the client, and

12. awards in similar cases.

488 F.2d at 717-19.

Having fully considered the above *Johnson* factors, the Court disagrees with Debtor's arguments that U.S. Bank failed to present any evidence as to the reasonableness of its fees. Merrick Gross testified that all the time entries relate to efforts to collect the indebtedness, and under the terms of the loan documents such attorney's fees and expenses are recoverable by U.S. Bank against Debtor.  [Trans. p. 60].  Mr. Gross testified that all of the fees incurred were in connection with prosecuting U.S. Bank's rights under the loan documents and that such services were necessary to protect U.S. Bank's interest.  *Id.* at pp. 94, 104, 105 & 112.  He further testified that the fees were actually incurred and billed to the client, though based on his supplemental declaration substantial credits were subsequently applied.  *Id.* at 110 & 117.  Based on the Court's consideration of the testimony of Mr. Gross, and the Court's review of the fee compilation admitted into evidence, the Court finds that, except for those amounts voluntarily reduced by U.S. Bank, the prepetition fees and expenses sought by U.S. Bank were reasonable and appropriate under the circumstances.  *See Matter of First Colonial Corp. of Am.*, 544 F.2d 1291, 1299-1300 (5th Cir. 1977) ("Once the nature and extent of the services rendered have been determined, the bankruptcy judge must assess the value of those services."); *see also In re Conkle*, No. 04-66229-WHD, 2005 WL 6490598, at *4 (Bankr. N.D. Ga. Jan. 31, 2005) ("once the nature and extent of the services have been determined, the bankruptcy judge must assess the value of those services, that is the reasonableness and necessity of the hours claimed and the hourly rate requested.").

Debtor raises several arguments in opposition to the fees and expenses requested, none of which in the Court's view merit further reduction of the attorney's fees requested in the proof of

claim above the amount voluntarily reduced by U.S. Bank. Debtor points to certain redacted credits appearing on the bills. Mr. Gross testified, though with some reservation because he did not have unredacted invoices in front of him, that any credits provided were very likely for post-petition invoices unrelated to the prepetition invoices at issue. [Trans. p. 111, l. 2-7]. Mr. Gross corrected this testimony following the hearing, and U.S. Bank voluntarily reduced the prepetition fees and expenses it seeks as part of its claim by $39,245.14. No further reduction based on Debtor's credit arguments is warranted. Debtor also points to time entries of Mr. Gross that use the same nomenclature for work performed on different days. Mr. Gross testified that is how he typically does his time entries, that he enters his time daily, and that he did not believe there were duplicative time entries in the fee compilation with only one possible exception, which he could not rule out without looking at unredacted invoices. *Id.* at 110. In sum, Debtor's remaining arguments are *de minimis* in scope and do not merit a further reduction of the legal fees and expenses sought in the proof of claim, particularly in light of the substantial voluntary reduction made by U.S. Bank.

Based on its review of the fee compilation and its consideration of the testimony of Mr. Gross in light of the *Johnson* factors, the court concludes that the hourly rates charged are reasonable and in line with the rates charged by Debtor's counsel in this case.[10] The matter was appropriately staffed with respect to the difficulty of the work, time limitations imposed by the circumstances, and the nature and length of the professional relationship between U.S. Bank and its attorneys. Moreover, the services performed were reasonable and necessary to protect the interests of U.S. Bank and are recoverable by U.S. Bank in accordance with sections 5.1.14 and

---

[10] The First Interim Application of Schreeder, Wheeler & Flint, LLP for Compensation and Reimbursement of Expenses [Doc. 104] reveals rates of $295 for Mr. Akins and $495 for Mr. Christy as counsel for Debtor. The fee compilation [Deb. Ex. 4] shows rates ranging from $350 to $450 for the primary counsel involved for U.S. Bank.

10.13 of the loan agreement.  The undesirability of the case is not relevant here, and the Court believes its approval of the fees is consistent with awards in other cases.   Debtor offered no contrary evidence as to the reasonableness of the fees incurred, and in the absence of contrary evidence, the Court finds the prepetition fees and expenses were reasonable and appropriately included as part of U.S. Bank's prepetition claim.  Based on the foregoing, and U.S. Bank's voluntary reduction of the prepetition legal fees and expenses requested in the proof of claim by the total amount of $41,710.29, the Court will allow prepetition legal fees and expenses in the amount of $41,289.71.  All remaining objections of Debtor to U.S. Bank's legal fees and expenses are overruled.

### B.    Liquidation Fee

Debtor also objects to U.S. Bank's inclusion of a liquidation fee of $57,264.74 as part of its prepetition claim.  Debtor argues that while the loan agreement requires Debtor to reimburse lender for any liquidation fees due to the special servicer, no liquidation fee has accrued under the servicing agreement to date, no such fee has been paid to the special servicer, and no such fee is owed by Debtor.  U.S. Bank counters that the liquidation fee is payable by Debtor in accordance with the terms of the loan agreement, and whether U.S. Bank has paid the fee to the special servicer is irrelevant.  Because the claim will either be paid through this bankruptcy case or through liquidation of the property, U.S. Bank argues the fee is owed by Debtor and properly included as part of its prepetition claim.

Both parties point to section 9.3 of the loan agreement as the starting point.  That section provides:

> Borrower shall promptly reimburse Lender on demand for …(b) all costs and expenses, liquidation fees, workout fees, special servicing fees, operating advisor fees or any other similar fees payable by Lender to Servicer which may be due and payable under the Servicing Agreement

11

> (whether on a periodic or a continuing basis) as a result of an Event of Default under the Loan, the Loan becoming specially serviced, the commencement or continuance of any enforcement action of any kind with respect to the Loan or any of the Loan Documents, a refinancing or a restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" of the Loan Documents, or any Bankruptcy Action involving Borrower, Guarantor or any of their respective principals or Affiliates, (c) all costs and expenses of any Property inspections and/or appraisals (or any updates to any existing inspection or appraisal) that Servicer or the trustee may be required to obtain (other than the cost of regular annual inspections required to be borne by Servicer under the Servicing Agreement)….

[Deb. Ex. 1, p. 70-71]. Debtor correctly argues, based on a facial reading of this provision, that in order for a liquidation fee to be payable by Debtor it must be "due and payable under the Servicing Agreement." A review of the only servicing agreement admitted into evidence[11] in turn defines "Liquidation Fee" as follows:

> A fee payable to the Special Servicer with respect to each Specially Serviced Loan or Serviced REO Loan or with respect to each Mortgage Loan repurchased by a Mortgage Loan Seller (except as specified in the following paragraph), in each case as to which the Special Servicer obtains a full, partial or discounted payoff from the related Borrower, a loan purchaser or Mortgage Loan Seller, as applicable, or any Liquidation Proceeds with respect thereto (in any case, other than amounts for which a Workout Fee has been paid, or will be payable), equal to:
> (a)  the lesser of:
> (i)  the product of 1.0% and the proceeds of such full, partial or discounted payoff or the Net Liquidation Proceeds related to such liquidated or repurchased Mortgage Loan or Specially Serviced Loan, as the case may be in each case exclusive of any portion of such payoff or Net Liquidation Proceeds that represents Penalty Charges;
> (ii)  $1,000,000; and
> (iii)  any applicable cap pursuant to Section 3.12(c) of this Agreement….

[Deb. Ex. 4, p. 46]. Among other things, Debtor argues no liquidation fee is owed by Debtor "until and unless a liquidation fee is actually paid by Lender to the special servicer." [Doc. 165, p.8].

---

[11] Deb. Ex. 3, Pooling and Servicing Agreement dated October 1, 2012, by and between Deutsche Mortgage & Asset Receiving Corporation as Depositor, Wells Fargo Bank, National Association, as Master Servicer, Midland Loan Services as Special Servicer, U.S. Bank National Association as Trustee, and Situs Holding, LLC as Operating Advisor regarding COMM 2012-CCRE3 Commercial Mortgage Pass-Through Certificates.

That argument, however, runs directly contrary to the specific terms of the loan agreement, which only requires such fee to be "due and payable to the Special Servicer…."  Debtor's better argument is that no such fee is payable until the special servicer "obtains a full, partial, or discounted payoff from the related Borrower" or obtains any "Liquidation Proceeds" as that term is defined in the servicing agreement.  Debtor argues neither of those events have occurred, and therefore, no liquidation fee is owing.

U.S. Bank counters that the liquidation fee is payable upon Debtor's prepetition default and offered testimony to that effect from Dustin Johnson, an asset manager from KeyBank National Association, the special servicer of the loan.  [Trans. p. 208].  In response to the question, "So when is a liquidation fee in your view due under Subsection B?"  Mr. Johnson answered: "On demand after an event of default."  *Id.*  Whether U.S. Bank has actually received a payoff or the property has been liquidated is irrelevant, according to U.S. Bank, because it will receive a payoff through this bankruptcy case or through liquidation of the property following this bankruptcy case.  [Doc. 175, p. 14].  U.S. Bank's arguments and Mr. Johnson's testimony, unfortunately, ignore key provisions as to when a liquidation fee is payable under the loan agreement and servicing agreement.  Debtor is only obligated to reimburse U.S. Bank for any liquidation fee "which may be due and payable under the Servicing Agreement (whether on a periodic or continuing basis) as a result of an Event of Default under the Loan…."  [Deb. Ex. 1, p. 85, Loan Agreement, § 9.3].  Nothing in section 9.3 of the loan agreement provides that a liquidation fee is due and payable upon default.  Instead, section 9.3 directs the parties to the servicing agreement for a determination of whether such a fee is due and payable, and the servicing agreement provides two scenarios through which liability for a liquidation fee accrues: (1) liquidation of the property to cash through

foreclosure or other means, which everyone agrees has not occurred; or (2) U.S. Bank obtains "a full, partial or discounted payoff" from Debtor.

U.S. Bank's arguments that it will either liquidate the property or receive a full, partial, or discounted payoff under any confirmed plan in this case miss the mark in at least three key respects. First, no liquidation of the property has occurred. Second, U.S. Bank's argument assumes a payment of any kind by Debtor following acceleration of the loan constitutes a "full, partial, or discounted payoff" within the meaning of section 9.3 of the loan agreement. The Court disagrees with that conclusion in large part based on a facial reading of the agreement. Contrast the language relative to payment of a liquidation fee, which requires payment of the fee upon "full, partial or discounted payoff," with the language in section 2.4.3 relative to a yield maintenance premium discussed below, which is triggered when "payment of all or any part of the Debt is tendered by Borrower for any reason or otherwise recovered by Lender (including, without limitation, through acceleration or the application of any Reserve Funds or Net Proceeds)." [Deb. Ex. 1, p. 40]. While a liquidation fee is only triggered upon a full, partial, or discounted payoff, a yield maintenance premium is triggered by a payment of any kind or any form of recovery by U.S. Bank. The triggering language is key, and the Court must give effect to the parties' choice of different words in different sections of the agreement. In Georgia, to avoid surplusage, different terms in different parts of an agreement should not be construed as interchangeable. *See Garrett v. S. Health Corp. of Ellijay*, 739 S.E.2d 661, 667-68 (Ga. Ct. App. 2013) (referencing *Flynt v. Life of South Ins. Co.*, 718 S.E.2d 343, 347 (Ga. Ct. App. 2011)). What constitutes a full, partial, or discounted payoff is not defined in the agreement, and the Court must give those terms their ordinary and customary meaning. *NW Parkway, LLC v. Lemser*, 709 S.E.2d 858, 861 (Ga. Ct. App. 2011) ("The first rule that courts must apply when construing contracts is to look to the plain meaning of the words of

14

the contract[.]") (quoting *Ga. Real Estate Properties v. Lindwall*, 692 S.E.2d 690, 692 (Ga. Ct. App. 2010)).  *See also* O.C.G.A. § 13-2-2(2) ("Words generally bear their usual and common signification; but technical words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning.").  Based on these authorities, the Court does not find that adequate protection payments made during the pendency of this case, or periodic monthly payments under a confirmed plan, would constitute a full, partial, or discounted payoff of the loan within the meaning of section 9.3 of the loan agreement.  Such payments are clearly not a full payoff of the loan, nor can they be considered a discounted payoff of the loan, which would require U.S. Bank's consent.  The only question then is whether such payments constitute a partial payoff of the loan, and the Court does not find such payments fall within the usual and customary meaning of that phrase.  A partial payoff of a loan usually involves a reduction of the loan balance through an irregular payment, though less than payment in full. Monthly loan payments do not count.  Otherwise, every payment made by Debtor during the life of the loan would trigger a liquidation fee.  The same logic applies to monthly adequate protection payments or monthly plan payments made in connection with a bankruptcy case.

Third, U.S. Bank's arguments ignore the fact that the liquidation fee is calculated, in part, by calculating "the product of 1.0% and the proceeds of such full, partial or discounted payoff or the Net Liquidation Proceeds…."  Even assuming for a moment that U. S. Bank's reading of the agreement is correct, and Debtor's payment of adequate protection payments during the pendency of this case constitute a partial payoff of the loan to which a liquidation fee attaches, in that scenario 1% of those payments comes nowhere close to the $57,264.74 liquidation fee included in the proof of claim.  Moreover, when questioned at the hearing as to whether Midland Loan Services, the prior special servicer, ever obtained a payoff from the borrower, Mr. Johnson responded

definitively "No."  [Trans. p. 212].  It is clear U.S. Bank calculated the liquidation fee simply by multiplying the outstanding balance of the loan at the time of default by 1%.  That is not what the documents provide.  U.S. Bank failed to provide any credible evidence or testimony to establish that the liquidation fee requested in the proof of claim is properly calculated in accordance with the terms of the loan agreement and servicing agreement or that such fee is actually due and payable currently.  As such, that portion of its claim will be disallowed without prejudice to its right to assert a claim for any liquidation fee as and when such fee becomes payable in the future.

### C.     Environmental Survey

Debtor also objects to U.S. Bank's inclusion of an environmental survey fee in the amount of $2,750, arguing that the fee is not provided for under the loan agreement or the servicing agreement.  U.S. Bank's arguments in support of the environmental survey fee evolved over time.  Initially, it contended the fee was due and payable in accordance with section 5.1.26 of the loan agreement [Doc. 175, p.14], which authorizes U.S. Bank "to obtain a new or updated appraisal of the Property from time to time, provided, however, that so long as no Event of Default has occurred Lender shall do so not more often than once in every twelve (12) month period."  [Deb. Ex. 1, p. 62].  Section 5.1.26 does not speak to environmental surveys in any respect.  At the hearing, U.S. Bank offered testimony from Mr. Johnson that section 9.3 of the loan agreement authorized reimbursement for the fee [Trans. p. 213, l. 16], that the fee was actually incurred and paid [Trans. p. 206, l. 25], and that lenders obtaining environmental surveys in advance of foreclosing on property is considered a best practice in the industry.  [Trans. p. 216, l. 19].  However, when cross examined as to where in the servicing agreement any requirement to obtain an environmental survey was set forth, Mr. Johnson offered no clarity other than pointing back to section 9.3 of the loan agreement and referencing general servicing standards in the servicing agreement.

Section 9.3 of the loan agreement provides for recovery of fees and expenses in a number of circumstances: (1) expenses paid by servicer or trustee in respect of protection and preservation of the property; (2) all costs and expenses due and payable under the servicing agreement; (3) all costs and expenses of any property inspections and/or appraisals (or any updates to any existing inspection or appraisal) that servicer or the trustee may be required to obtain; and (4) other costs and expenses not relevant to this case. U.S. Bank does not argue that the environmental survey was an expense made in respect of protection or preservation of the property. Instead, U.S. Bank argues that the environmental survey is a cost and expense due and payable under the servicing agreement but provided no testimony or guidance for the Court as to where in the servicing agreement that obligation arises. Similarly, an environmental survey may very likely constitute a property inspection, but U.S. Bank failed to offer any testimony or evidence as to where a servicer or trustee was required to obtain such a survey under the loan agreement, the servicing agreement, or any other relevant document. The Court does not question that it is an industry best practice to obtain an environmental survey before conducting a foreclosure sale of an operating hotel, nor does the Court question that such fees are typically reimbursable by a debtor under the terms of most loans agreements. U.S. Bank, however, failed to point the Court to where Debtor's obligation to reimburse it for such a survey arises under the applicable documents in this case. U.S. Bank failed to carry its burden to establish its entitlement to reimbursement for the environmental survey, and that portion of its claim will be disallowed.

### D.     Yield Maintenance Premium

Finally, Debtor raises objections to U.S. Bank's inclusion of a yield maintenance premium of $532,036.69 in its proof of claim. First, Debtor argues the yield maintenance premium, which it refers to as a prepayment penalty, is unenforceable under the plain terms of the loan documents

because Debtor has not prepaid the debt. Secondly, it argues the terms of the loan documents, Georgia law, and § 506(b) do not allow U.S. Bank to charge both a prepayment penalty and continuing contractual interest as such would constitute a double recovery. U.S. Bank counters that the yield maintenance premium asserted in its proof of claim is clearly enforceable under the loan agreement and Georgia law and does not constitute a double recovery such that it is entitled to payment of both the yield maintenance premium and post-petition interest on its claim. Most courts considering a creditor's entitlement to a yield maintenance premium analyze the issue under both relevant state law and § 506(b).[12]

### 1.    Enforceability under Georgia Law

The Court first considers Georgia law as the contracts here are governed by Georgia law. [Deb. Ex. 1, p. 87, § 10.3]. Unfortunately, unlike some jurisdictions, Georgia does not have a substantial body of case law analyzing the enforceability of yield maintenance premiums. Georgia's legislature, however, has spoken on the issue and declared that prepayment penalties, a term often interchangeable with yield maintenance premiums, are recoverable if stipulated to in a contract. O.C.G.A. § 7-4-2(b)(2) ("Unless stipulated in the contract, there shall be no prepayment penalty."). *See In re Brandywine Townhouses, Inc.*, 518 B.R. 671, 677 (Bankr. N.D. Ga. 2014) (J.

---

[12] *See, e.g., In re Amigo PAT Texas, LLC*, 579 B.R. 779, 782 (S.D. Tex. 2017); *In re AE Hotel Venture*, 321 B.R. 209, 217 (Bankr. N.D. Ill 2005) (noting that for creditor to receive prepayment premium, premium must be enforceable under state law and must also satisfy § 506(b)); *In re Schwegmann Giant Supermarkets P'ship*, 264 B.R. 823, 827–28 (Bankr. E.D. La. 2001) (recognizing that when determining whether to award prepayment fees, courts look to federal and state law); *In re Duralite Truck Body & Container Corp*., 153 B.R. 708, 711–15 (Bankr. D. Md. 1993) (undertaking analysis of state law and § 506(b) when determining whether prepayment premium is allowed); *Noonan v. Fremont Fin.* (*In re Lappin Elec. Co.*), 245 B.R. 326, 329 (Bankr. E.D. Wis. 2000) (same); *In re Kroh Bros. Dev. Co.,* 88 B.R. 997, 1001 (Bankr. W.D. Mo. 1988) (same).

Ellis-Munro).[13]   The only conclusion the Court can draw from Georgia law is that prepayment

penalties are enforceable if stipulated in the contract between the parties.[14]

Here, the loan agreement specifically provides for recovery of a yield maintenance

premium under certain circumstances.   The operative provision of the loan agreement, section

2.4.3, provides:

> If, following the occurrence and during the continuance of an Event of
> Default, payment of all or any part of the Debt is tendered by Borrower
> for any reason or otherwise recovered by Lender (including, without
> limitation, through acceleration or the application of any Reserve Funds
> or Net Proceeds), such tender or recovery shall include (a) interest at the
> Default Rate on the outstanding principal amount of the Loan from the
> date such Event of Default occurred through the end of the Interest
> Period related to the Payment Date next occurring following the date of
> such tender or recovery, or if such tender or recovery occurs on a
> Payment Date, through and including the Interest Period related to such
> Payment Date and (b) an amount equal to the applicable Yield
> Maintenance Premium.

[Deb. Ex. 1, p. 25].   While acknowledging the agreement specifically provides for a yield

maintenance premium, Debtor nonetheless argues based on the above language that it "has not

---

[13] The limited number of cases other than *Brandywine* cited by the parties applying Georgia law bear little similarities to the facts of this case or the provisions at issue.  *See Wells Fargo Bank, NA v Mitchell's Prk LLC*, 2012 WL 4899888, at *6 (N.D. Ga. Oct. 11, 2012) (awarding deficiency judgment which included yield maintenance premium following foreclosure sale*); In re Curtis v. Pilgrim Health and Life Ins. Co.*, 83 B.R. 853 (Bankr. S.D. Ga. 1988) (enforcing prepayment penalty in chapter 13 case as a charge and not interest).

[14] U.S. Bank also points out that several courts in determining the enforceability of yield maintenance premiums under state law look to the applicable state contract law rules for enforcement of liquidated damages provisions.  *See In re 1141 Realty Owner LLC*, 598 B.R. 534, 541-42 (Bankr. S.D.N.Y. 2019).  U.S. Bank, however, fails to cite to any applicable Georgia law for enforceability of liquidated damages provisions and failed to offer any evidence, analysis, or arguments as to how the contractual provisions at issue here satisfy the requirements for an enforceable liquidated damages provision under Georgia law.  Georgia applies a three-part test for analyzing the enforceability of liquidated damages.  *Fuqua Const. Co. v. Pillar Dev., Inc.*, 667 S.E.2d 633, 635 (2008) (finding the liquidated damages provision was reasonable and enforceable) (referencing *Southeastern Land Fund v. Real Estate World*, 237 Ga. 227, 227 (1976)).  "First, the injury caused by the breach must be difficult or impossible of accurate estimation; second, the parties must intend to provide for damages rather than for a penalty; and third, the sum stipulated must be a reasonable pre-estimate of the probable loss."  *Id.* (citing *Southeastern Land Fund*, 237 Ga. at 230).  These three elements must each be met in order for a liquidated damages provision to be enforceable in Georgia.  *Caincare, Inc. v. Ellison*, 612 S.E.2d 47, 50 (Ga. Ct. App. 2005) (finding that liquidated damages were not a reasonable pre-estimate of probable loss) (referencing *Southeastern Land Fund*, 237 Ga. at 230); see also *Mariner Health Care Mgmt. Co. v. Sovereign Healthcare, LLC*, 703 S.E.2d 687, 689-90 (Ga. Ct. App. 2010) (finding liquidated damages provision enforceable).

tendered the entire outstanding principal of the loan—or any other prepayment—and [U.S. Bank] has not recovered the outstanding debt." [Doc. 165, p. 4]. Based on that, Debtor argues the plain language of the loan agreement does not authorize U.S. Bank to recover a prepayment penalty until and unless such amounts are tendered or recovered.

U.S. Bank argues where contractual provisions specifically provide for payment of yield maintenance premiums upon acceleration, as section 2.4.3 of the loan agreement does, courts enforce such terms. [Doc. 175, p. 8].[15] In addition to section 2.4.3, U.S. Bank points to section 8.1(b) of the loan agreement which authorizes U.S. Bank to accelerate the loan and declare all obligations under the loan documents immediately due and payable upon default, and in the case of a bankruptcy filing, the "Debt" and "Other Obligations" are automatically declared immediately due and payable. As defined in the loan agreement, "Obligations" includes "Borrower's obligations for the payment of the Debt" and "Debt" in turn is defined as "the Outstanding Principal Balance together will all interest accrued and unpaid thereon and all other sums (including the Yield Maintenance Premium) due to Lender in respect to the Loan…." [Deb. Ex. 1, p. 26, 19]. U.S. Bank thus argues that under sections 2.4.3 and 8.1(b) of the loan agreement, upon an event of default, whether upon acceleration or a bankruptcy filing, the yield maintenance premium became due and owing prepetition and is a valid part of its claim. [Doc. 201, p. 5].

The Court agrees with U.S. Bank, at least in part. Debtor defaulted on the loan and U.S. Bank accelerated the indebtedness prebankruptcy, facts which Debtor does not dispute. U.S. Bank's acceleration of the indebtedness triggered Debtor's obligation to pay all amounts due and

---

[15] In support of this proposition U.S. Bank cites *In re Madison 92nd Street Associates, LLC,* 472 B.R. 189 (Bankr. S.D.N.Y. 2012). The court in *Madison,* however, was faced with the issue of the *res judicata* effect of a prepetition default judgment on a loan, where the default judgment included a prepayment premium which authorized the lender to collect a premium of five percent of the outstanding balance of the loan upon default. The court there did not face the same issues before this Court.

owing under the loan, including its obligation to pay a yield maintenance premium.  That much is

clear enough.  Less clear is how and when the yield maintenance premium should be calculated.

The loan agreement defines "Yield Maintenance Premium" as:

> an amount equal to the greater of (a) one percent (1%) of the outstanding
> principal balance of the Loan to be prepaid or satisfied and (b) the excess,
> if any, of (i) the sum of the present values of all then-scheduled payments
> of principal and interest under the Note assuming that all scheduled
> payments are made timely and that the remaining outstanding principal
> and interest on the Loan is paid on the Maturity Date (with each such
> payment and assumed payment discounted to its present value at the date
> of prepayment at the rate which, when compounded monthly, is equivalent
> to the Prepayment Rate when compounded semi-annually and deducting
> from the sum of such present values any short-term interest paid from the
> date of prepayment to the next succeeding Payment Date in the event such
> payment is not made on a Payment Date), over (ii) the principal amount
> being prepaid; provided that following the occurrence and during the
> continuance of an Event of Default, the Yield Maintenance Premium shall
> be equal to the sum of (a) and (b).

[Deb. Ex. 1, p. 37].  As the last part of the definition makes clear, "following the occurrence and

during the continuance of an Event of Default," you determine the premium by adding the sums

calculated under parts (a) and (b) together.  The calculation under part (a) is easy enough.  One

percent of the outstanding principal balance of the loan to be repaid ($4,962,960.56) equals

$49,629.60.  Calculating the balance of the premium under part (b) is not as simple.  To calculate

that portion of the premium, one must determine the applicable "Prepayment Rate," which is

defined in reference to the "Prepayment Rate Determination Date," which is further defined as

"the date which is five (5) Business Days prior to the date such prepayment shall be applied in

accordance with the terms and provisions of Section 2.4.1 hereof."  Based on such language,

Debtor argues the yield maintenance premium cannot be calculated until it is known what day the

payment is applied and the amount of the principal to be prepaid.  [Doc. 206, p. 7].  The Court

agrees.  Calculating the second part of the premium under the agreement requires knowing the date of any prepayment and the amount of the prepayment.

U.S. Bank in its proof of claim used the Debtor's petition date, August 31, 2020, as an assumed prepayment date for purposes of its calculation.  Felix Bayani, a loan administrator with Well Fargo,[16] testified that the yield maintenance premium was calculated assuming a prepayment date of August 31, 2020.  [Trans. p. 160].  He also testified that no prepayments had been made on the loan as of that date.  [Trans. p. 172].  Nothing in the loan documents—at least as far as U.S. Bank has pointed to the Court—authorizes U.S. Bank to assume for purposes of calculating the yield maintenance premium that the prepayment date is the date Debtor filed its bankruptcy case. While sections 2.4.3 and 8.1(b) of the loan agreement make clear that upon default and acceleration U.S. Bank is entitled to recover a yield maintenance premium, those sections do not otherwise alter how the premium is calculated.  And nowhere in the loan agreement is Debtor's bankruptcy petition date authorized to be used for calculating the premium.

Moreover, nothing in the loan documents authorize U.S. Bank to use the outstanding principal balance of the loan as the amount against which the discounted present value calculations are compared when calculating the part (b) portion of the premium.  Mr. Bayani testified that to do a proper calculation of the premium you first look at the definition of the yield maintenance premium in the loan document and then "follow whatever is spelled out in the definition."  [Trans. p. 156].  He then testified as to what was done to calculate the premium.  He testified that first you calculate the one percent of the outstanding principal balance of the loan, which is consistent with the Court's calculation of part (a) above.  Mr. Bayani then testified you proceed to calculate the sum of the present values of the scheduled payments of principal and interest under the note

---

[16] Wells Fargo Bank, NA is the master servicer of the loan.

through maturity, including the balloon payment at the end of the term.  [Trans. p. 157].  Then you apply a discount rate based on what is provided in the loan documents to get the present value of those future cash flows.  *Id*.  That testimony assumes a prepayment date of August 31, 2020, which the Court previously indicated is not proper.  He then testified you "sum up all of those values… and then deduct that from the outstanding principal balance at the time of prepayment" to get the excess, which amount when added to the part (a) calculation gives you the total yield spread premium.  *Id*. at 157-58.  The Court has a couple of issues with this portion of his testimony.  First, it appears he has the calculation in reverse, which may have been a simple misstatement.  He testified you deduct the present value calculation of future payments from the outstanding principal balance of the loan.  The Yield Spread Premium definition, however, makes clear the principal being prepaid is deducted from the present value calculation.  The formula provides that it is the sum of the present value calculation of future payments "over" the principal being prepaid. Second, the Yield Spread Premium definition nowhere provides that the outstanding principal balance is part of the calculation, it is the amount of principal being prepaid.  Mr. Bayani's testimony, and more importantly, U.S. Bank's calculation of the premium simply do not conform to the loan agreement's provisions.

Of note, in some of the cases cited by U.S. Bank, the yield maintenance premiums being enforced specifically contemplated a different methodology for calculating the premium in a default payment scenario versus a nondefault prepayment scenario.  *See In re 1141 Realty Owner LLC,* 598 B.R. 534 (Bankr. S.D.N.Y. 2019) (enforcing "Yield Maintenance Default Premium" under New York law where loan documents clearly contemplated any payment following event of default constituted voluntary payment triggering premium); and *In re Anchor Resolution Corp.*, 221 B.R. 330, 333 (Bankr. D. Del. 1998) (enforcing make-whole premium calculated based on

prevailing interest rates as of prepayment or default date).  The loan agreement here provides no alternative calculation methodology for a default payment versus a nondefault prepayment scenario.  That fact is made abundantly clear because the "Prepayment Rate Determination Date," which is a defined term within the definition of Yield Maintenance Premium, points to section 2.4.1 of the loan agreement.  Section 2.4.1 in turn relates to voluntary prepayments of the loan in a nondefault scenario, whereas section 2.4.3 applies to prepayments made while an event of default exists.  No similar provision exists in the loan agreement for calculating the Prepayment Rate Determination Date in a default scenario.  Whether an oversight or a drafting error, the Court believes this presents substantial obstacles to calculating the part (b) portion of the premium in a default scenario.

Based on the above, the only conclusion the Court can draw from the evidence before it is that as of the petition date U.S. Bank held a prepetition unliquidated claim for a yield maintenance premium as a result of Debtor's default.  At the time of any tender by the Debtor or recovery by U.S. Bank, which has occurred by virtue of adequate protection payments made in this case, the yield maintenance premium became liquidated in the amount of $49,629.60, representing one percent of the outstanding principal of the loan in accordance with part (a) of the calculation.  The Court has no competent evidence before it properly calculating the part (b) portion of the premium in accordance with the terms of the loan documents, and such portion is disallowed without prejudice to U.S. Bank's right to provide additional evidence at the confirmation hearing on Debtor's proposed plan to establish its entitlement to the same, to the extent that is possible.  U.S. Bank is not entitled to recover a yield maintenance premium in the amount of $532,036.69 as asserted in its proof of claim as that premium amount was calculated using assumptions inconsistent with the loan agreement.

## 2. Reasonableness Arguments under § 506(b)

Debtor also argues that even if the Court finds the yield maintenance premium enforceable under the contract and state law, the Court should nonetheless disallow the charge as unreasonable under § 506(b). That section provides:

> To the extent that an allowed secured claim is secured by property, the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b). Thus, for a yield maintenance premium to be enforceable under § 506(b), the premium must be "provided for under the agreement" and "reasonable." The Court previously addressed whether a yield maintenance premium is provided for under the loan agreement, so the only remaining issue under § 506(b) is the question of reasonableness. In support of its position, Debtor points to a number of bankruptcy court decisions that disallowed prepayment penalties because they constitute a penalty rather than a reasonable estimate of the lender's damages due to pre-payment. *See In re Amigo PAT Texas, LLC*, 579 B.R. 779, 784-785 (S.D. Tex. 2017); *In re Schwegmann Giant Supermarkets P'ship*, 264 B.R. 823 (Bankr. E.D. La. 2001); *In re Duralite Truck Body & Container Corp.*, 153 B.R. 708, 714 (Bankr. D. Md. 1993). In contrast, U.S. Bank points to a number of cases where bankruptcy courts enforced prepayment penalties as reasonable. *See, e.g.*, *In re Brandywine Townhouses, Inc.*, 518 B.R. 671 (Bankr. N.D. Ga. 2014) (finding prepayment penalty of approximately 36% of principal balance due was not unreasonable and would be allowed as component of loan assignee's claim); *In re 1141 Realty Owner, LLC*, 598 B.R. 534 (Bankr. S.D.N.Y. 2019) (enforcing under New York law mortgage lender's claim for yield maintenance premium in the amount of $3,108,096.78*); In re AE Hotel Venture*, 321 B.R. at 217 (enforcing prepayment penalty of 18% of loan balance under Illinois law). Neither party

provides any particularly helpful analysis as to how these cases apply to the facts of this case, other than their citation to cases favorable to their respective positions.

In determining reasonableness of yield maintenance premiums under § 506(b), courts look at a number of factors, including: (1) whether the prepayment premium approximates actual damages; (2) the amount of prepayment premium as a percentage of the principal of the loan amount; and (3) the effect on junior creditors with this factor being "especially significant" though not dispositive for some courts. *See Amigo*, 579 B.R. at 783 (citing multiple cases). The Court analyzes the yield maintenance premium in this case under these factors.

### *a)* Does the yield maintenance premium approximate actual damages?

First, courts look to whether the applicable yield maintenance premium approximates actual damages in determining reasonableness under § 506(b). To be reasonable, the yield maintenance premium should effectively estimate actual damages. *Id.* at 783 (citing *Duralite Truck Body & Container Corp.,* 153 B.R. at 714). Yield maintenance premiums are intended to protect the lender from any loss it may incur because of changing interest rates between the time of the prepayment and the maturity date of the loan. *Brandywine*, 516 B.R. at 678 (citing *In re Imperial Coronado Partners, Ltd.,* 96 B.R. 997, 1001 (9th Cir. BAP 1989)). Thus, actual damages are generally measured by the difference between the market rate of interest at the time of prepayment and the contract rate for the loan until maturity, discounted to present value. *Amigo*, 579 B.R at 783 (citing *Schwegmann Giant Supermarkets P'ship*, 264 B.R. at 829).

The yield maintenance premium here is a mixed bag. On the one hand, a portion of the formula for calculating the premium (part (b) described above) provides for use of market interest rates to calculate actual projected damages from a prepayment of the loan discounted to present value. On the other hand, the formula fails to clearly provide a calculation methodology for a

default payment scenario, and the calculation tacks on an additional 1% of the principal amount of the loan as part of any calculation. *Amigo* and *Schwegmann* found similar tacking provisions unreasonable. More importantly, several courts refused to enforce prepayment premiums in the absence of evidence from the party seeking enforcement that the party actually suffered damages as a result of the loan's acceleration. *See Amigo*, 579 B.R. at 784 (creditor's failure to offer any evidence of actual damages weighed heavily against allowing prepayment premium); *Schwegmann Giant Supermarkets P'ship*, 264 B.R. at 832 (creditor failed to meet its burden of proving amount of its proof of claim when it did not introduce any evidence of actual damages and its representative was unable to articulate the damages incurred as a result of early payoff of loan); *In re 400 Walnut Assocs., L.P.*, 461 B.R. 308, 322 (Bankr. E.D. Pa. 2011), *rev'd and remanded on other grounds*, 473 B.R. 603 (Bankr. E.D. Pa. 2012) (creditor's lone witness offered no evidence in support of creditor's claim that it suffered loss as a result of debtor's default); *Sachs Elec. Co. v. Bridge Info. Sys., Inc., (In re Bridge Info. Sys., Inc.)*, 288 B.R. 556, 564 (Bankr. E.D. Mo. 2002) (disallowing prepayment premium where creditor failed to meet burden of proof establishing actual damages from prepayment); *In re Maywood, Inc.*, 210 B.R. 91, 94 (Bankr. N.D. Tex. 1997) (finding prepayment premium not reasonable under § 506(b) when creditor offered no evidence of any damages); *Kroh Bros. Dev. Co.*, 88 B.R. at 1001 (same). Here, U.S. Bank offered no evidence or argument that the yield maintenance premium approximated actual damages, and likewise offered no argument or evidence it has or will suffer any damages as a result of the loan's acceleration. The first factor weighs against enforcement of the premium in this case.

### *b)*    Yield maintenace premium as a percentage of the principal outstanding

Courts also look at the ratio of the premium to be paid in comparison to the outstanding principal amount of the loan when deciding reasonableness under § 506. In *Amigo*, the court found

a prepayment premium of 4.9% of a loan's outstanding principal weighed in favor of allowing the prepayment.  579 B.R. at 784-85.  In contrast, the court in *Schwegmann* found a prepayment premium unreasonable when it approximated 18% of the principal amount of the loan.  264 B.R at 832.  *See also Kroh Bros. Dev. Co.,* 88 B.R. at 1002 (disallowing prepayment premium of 25% of principal loan amount but citing with approval case law permitting percentages of up to 10%); and *Lappin Elec. Co.,* 245 B.R. at 330-31 (allowing prepayment premium of 6.9% of principal).  The applicable percent, however, is not always dispositive as the court in *Brandywine* found a prepayment premium of approximately 36% to be reasonable where the evidence established the prepayment penalty in fact approximated the potential loss to the lender from early payment.  518 B.R. at 678.  *See also In re AE Hotel Venture*, 321 B.R. at 217 (enforcing prepayment penalty of 18% of loan balance under Illinois law).  In this case, the amount of the premium determined by the Court to be allowable as calculated under the loan agreement represents only one percent of the outstanding principal of the loan, an amount at the low end of the range of percentages allowed by other courts.  This factor weighs in favor of enforcing the premium.

### *c)*  **Effect on junior creditors**

Finally, and most significantly, courts look at the effect allowance of the premium will have on other creditors.  In *Amigo,* the court found "especially significant" the fact that junior creditors who were receiving only 40 percent of their allowed claims were being directly and negatively affected if the prepayment premium was allowed.  579 B.R. at 785 (citing *Yazoo Pipeline Co., L.P.*, 2009 WL 2857863, at *3); *see also Maywood, Inc.,* 210 B.R. at 94 (disallowing early termination fee in chapter 7 where it would have adverse effect on unsecured creditors); *Schwegmann Giant Supermarkets P'ship,* 264 B.R. at 832 (disallowing prepayment penalty where net effect was to penalize debtor and junior creditors); *In re Bridge Info. Sys., Inc.,* 288 B.R. at 564

(finding prepayment premium inequitable where it would negatively impact return to other creditors).

In this case, the Court finds allowance of the yield maintenance premium would have little, if any, impact on other creditors. Debtor's plan proposes payments of $3,541 per month into a plan funding pool for the benefit of general unsecured creditors commencing after Debtor pays off a prepetition claim to Best Western International, Inc. in the amount of $48,212.82. The plan proposes payments of $3,541 monthly to Best Western until its claim is paid in full, and then payments in the same amount will be directed to a plan funding pool for the benefit of unsecured creditors. Once Best Western's prepetition claim is satisfied, general unsecured creditors will receive distributions from the plan funding pool not less frequently than every 180 days until such claims are paid in full. Under Debtor's proposed plan, payments to unsecured creditors are not impacted by allowance or disallowance of a yield maintenance premium to U.S. Bank. Instead, they are impacted by how long it takes Debtor to repay any prepetition arrearage owed to Best Western. As far as the Court can tell, the only parties impacted by allowance of a yield maintenance premium in this case are Debtor's equity holders who propose to retain their interest in Debtor under the plan. Debtor's equity holders are the very parties who agreed to the premium in the first place at the time the original loan was obtained, and the Court finds no equitable principles favoring disallowance of a premium they agreed to from the outset. This factor weighs in favor of enforcement of the yield maintenance premium provisions in this case.

Having considered each of the above factors, and only the first factor favoring disallowance of the premium, two of the three factors weighing in favor of allowance, and the third factor being the most significant factor weighing in favor of allowance, the Court finds that allowance of a yield maintenance premium in this case in the amount of $49,629.60 is reasonable under § 506(b)

and U.S. Bank is entitled to a yield maintenance premium in that amount.  This determination is without prejudice to U.S. Bank's right to offer additional evidence seeking allowance of any amounts under part (b) of the calculation at the hearing on confirmation of Debtor's plan consistent with this decision, and without prejudice to Debtor's right to contest such evidence or challenge the reasonableness of any additional amounts sought.

### 3. Double Recovery Arguments

Finally, the Court addresses the remaining issue raised by the parties—the issue of double recovery.  Debtor argues U.S. Bank cannot recover both the yield maintenance premium and subsequent interest as such would constitute an impermissible double recovery.  Debtor argues a portion of the yield maintenance premium is intended to compensate U.S. Bank for any loss in the present value of its expected payments of principal and interest under the loan agreement resulting from prepayment of the principal (*i.e.*, the part (b) calculation).   To the extent the yield maintenance premium has been triggered, Debtor argues the loan agreement plainly contemplates that interest stops accruing following such "tender or recovery," citing section 2.4.3 of the loan agreement.  Debtor cites cases where courts disallowed both continuing default interest and a yield maintenance premium as such would constitute an impermissible double recovery.  *See In re Anchor Resolution Corp.*, 221 B.R. 330, 334 (Bankr. D. Del. 1998); *Federal Nat'l Mortg. Ass'n v. Coleman Towers Tenants Ass'n, Inc.*, No. FSTVC 116008222S; 2015 WL 6144025, at *23 (Conn. Super. Ct. Sept. 14, 2015).

U.S. Bank for its part argues the yield maintenance premium is part of its prepetition claim, and U.S. Bank's entitlement to post-petition interest under section 506(b) is wholly separate and distinct from any prepetition amounts comprising its prepetition claim.  U.S. Bank argues the *Anchor* decision, relied upon by the Debtor, actually supports its position.  [Doc. 175, pp. 11-12].

*Anchor* involved two make-whole charges, U.S. Bank argues, one calculated prepetition and one calculated post-petition. *Anchor*, 221 B.R. at 334-35. The creditor sought post-petition interest on both, and the court reduced the creditor's claim for post-petition interest that accrued solely on the post-petition make-whole amount because the creditor had received monthly interest payments post-petition, and the post-petition make-whole amount expressly included that very charge. U.S. Bank argues the *Anchor* court did not reduce the post-petition interest on the prepetition make-whole amount.

The arguments of both parties on this point, it seems to the Court, rest on the assumption that the Court would allow the yield maintenance premium in the amount as calculated in U.S. Bank's proof of claim, which the Court has not done. As set forth above, the Court is not allowing a prepetition yield maintenance premium in the amount of $532,036.69, and, as such, U.S. Bank cannot obtain a double recovery of such amount. Consistent with the terms of the loan agreement, U.S. Bank is entitled to a yield maintenance premium in the amount of $49,629.60, representing 1% of the principal balance. That premium does not represent interest under the loan but is a charge provided for under the loan agreement as a result of Debtor's default. Thus, allowance of both that amount and post-petition interest is not a double recovery. If any portion of the part (b) calculation is allowed in the future, the Court will then address whether post-petition interest on outstanding principal would constitute a double recovery. Regardless, U.S. Bank is not entitled to post-petition interest on whatever amount of premium is allowed. Section 2.4.3 of the loan agreement on its face does not contemplate payment of interest on any yield maintenance premium. The Court believes its reading of the loan agreement, as set forth above, resolves any issues as to double recovery, at least for now.

## **CONCLUSION**

Based on the foregoing, it is hereby ORDERED as follows:

(1) Debtor's objections to U.S. Bank's attorney's fees and expenses are sustained in part and overruled in part, and U.S. Bank is allowed prepetition attorney's fees and expenses in the amount of $41,289.71;

(2) Debtor's objection to the liquidation fee is sustained and such claim is disallowed without prejudice to U.S. Bank's right to assert a claim for any liquidation fee as and when such fee becomes payable in the future consistent with this ruling;

(3) Debtor's objection to the environmental survey fee is sustained and that portion of the claim is disallowed;

(4) Debtor's objection to the yield maintenance premium is sustained in part and overruled in part.  U.S. Bank is entitled to a yield maintenance premium in the amount of $49,629.60, representing 1% of the outstanding principal of the loan, and will be entitled to offer additional evidence at the hearing on confirmation of Debtor's plan as to its entitlement to amounts under part (b) of the premium calculated in accordance with the terms of the loan documents. Debtor shall have the opportunity to contest any additional evidence offered and the reasonableness of any additional premium that may be sought; and

(5) U.S. Bank has an allowed prepetition claim in the amount of $5,618,770.67.

The Clerk is directed to serve a copy of this Order on counsel for Debtor and counsel for U.S. Bank National Association.

### **END OF ORDER**